# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THE HORSLEY COMPANY, LLC,

          Plaintiff,

v.                                               Case No. 12-C-655

MILWAUKEE COUNTY,

          Defendant.

## DECISION AND ORDER

This contract action commenced by Plaintiff Horsley Company, LLC ("Horsley"), against the Defendant Milwaukee County (the "County") for declaratory judgment and permanent injunctive relief relates to Horsley's bid for an improved outbound baggage system for General Mitchell International Airport ("GMIA"). This Decision and Order addresses Horsley's motion for a preliminary injunction. Also, pending is the County's motion to dismiss which will be addressed in a separate decision.

### PRELIMINARY INJUNCTION MOTION

By its preliminary injunction motion, Horsley requests that the County be enjoined from rebidding the "Baggage Screening Project – Phase C, Checked Baggage Inspection System (Project A044-09002-03)" (the "Project") and from awarding the contract for the Project to any entity other than Horsley.

**Factual Background**

The County owns and operates GMIA. Currently, GMIA serves about 141,664 passenger aircraft operations annually from eight different airlines and a daily average of 26,089 passengers. (C. Barry Bateman ("Bateman") Aff. ¶¶ 2 & 3.) (ECF No. 15-1.) Approximately 57 percent of GMIA's passengers reside outside of the County. (*Id*. at ¶ 3.) GMIA is responsible for handling approximately 9,500 pieces of luggage daily. (*Id*. at ¶ 4.) A poorly functioning baggage handling system ("baggage system") can have disastrous and costly consequences for airports and can have tremendous logistical and financial consequences for airlines, leading to frustrated and dissatisfied passengers. (*Id*. at ¶ 5.)

Like most airports, GMIA's baggage system addresses two types of operations - outbound and inbound baggage handling. (Timothy M. Kipp ("Kipp") Aff. ¶ 2.) (ECF No. 15-2.) The outbound leg accepts luggage from a departing airline passenger, transports the bag to a sorter, passes the bag through a security scanner screening system, and then sorts and delivers the bag for loading on an aircraft. (*Id*. at ¶ 3.) The inbound leg accepts luggage from incoming aircraft and delivers it to baggage carousels for passenger pick up. (*Id*. at ¶ 4.) The inbound leg does not route the luggage through security screening because the luggage was screened at the point of departure. (*Id*. at ¶ 5.)

GMIA's current baggage system, which was designed over 25 years ago, is outdated and inefficient. (*Id*. at ¶ 6.) Specifically, the security screening of outbound luggage is conducted by a time-consuming manual process because the current system cannot perform

2

that function. (*Id*. at ¶ 7.) Also, because the inbound and outbound baggage system legs were constructed at different times by different contractors with parts from different manufacturers, they are difficult to operate and expensive to maintain. (*Id*. at ¶ 8.) The differences in training requirements, service, maintenance, controls, and software lead to "constant" breakdowns, frustration, and inefficiency. (*Id* at ¶ 9.)

In 2010, GMIA began designing a replacement for the existing baggage system. (*Id.* at ¶ 9.) The County anticipates that the new baggage handling system will cost over 14 million dollars. (*Id*. at ¶ 10.) Because funding was obtained first for the outbound leg of the system, the outbound leg was designed and offered for bid earlier than the inbound project. (*Id*. at ¶ 11.)

Bateman, GMIA's director, indicates that the system was divided into two separate parts for bidding because the funding for the new baggage system was expected to come from several different sources. (Bateman Aff. ¶ 6.) For example, the Transportation Security Administration ("TSA") agreed to fund part of the outbound leg's security screening function, but not the inbound leg. (*Id.* at ¶ 7.) While funding is now available from the United States Department of Transportation for the inbound leg, those funds did not become available "until long after" funding was available for the outbound leg. (*Id*. at ¶ 8.) As the project developed, separate consultants were hired to design the inbound and outbound legs of the baggage handling system. (*Id.*)

3

In 2011, Milwaukee County issued a notice that it was placing the Project involving the outbound baggage handling system out for public bid. (Jay H. Bouton ("Bouton") Decl. ¶ 3.) (ECF No. 6.) The request for proposals ("RFP") for the Project required a minimum level of experience in the construction of baggage systems at passenger airports of GMIA's size or larger. (Kipp Aff. ¶ 12.) Such requirement is justified by the complexity, expense, and operational importance of such systems for airports and airlines. (*Id.* at ¶ 13.) The new outbound baggage handling system, designed by the County's design team, is to be a sophisticated system with interactions of computerized controls, photo-eyes, high-speed diverters, explosive detection machines, and cutting edge computer software, that is independent from the inbound baggage system bringing bags into the terminal from incoming planes. (*See* Bouton Decl. at ¶ 4.)

On February 22, 2012, Horsley submitted its timely bid on the Project to the County. (*See id.* at ¶ 5.) The "Minimum Qualification Requirements" for the Project, met by Horsley, were included in the bid documents at "Special Provisions, GMIA: Checked Baggage Screening Project – Phase C," at paragraph four. (*Id.* at ¶ 6.)

Diversified Conveyors, Inc. ("Diversified"), also bid on the Project. (Kipp Aff. ¶ 15.) Diversified did not appear to meet the minimum requirements. (*Id.*) When Diversified received notice that its bid was not likely to be accepted, Diversified threatened to file an administrative protest. (*Id.*)

4

On February 23, 2012, Kipp, Managing Design Engineer for the County Department of Public Works Architecture and Engineering, formally notified Horsley that it was the low bidder on the Project, and enclosed the bid tabulations of the companies that had submitted bids on the Project. (Bouton Decl. ¶ 7). On March 22, 2012, Ms. Freida Webb ("Webb"), County Director of Community Business Development Partners, formally notified Horsley that all questions about whether Horsley had met or exceeded the requirements for County's goal of good faith efforts to involve "DBE"[1] participation on the Project had been resolved in Horsley's favor. (*Id.* at ¶ 8.)

On March 28, 2012, Kipp sent Horsley the contract for the Project, and asked that "four (4) copies of the agreement" be forwarded back to him "for review and execution by . . . [the] County." (*Id*. at ¶ 9.) On April 6, 2012, Kipp sent Bouton, Horsley's corporate sales manager, an email stating "I mispoke in the letter that was attached to the contract. The administrative award was not signed as of yet. This should not be a problem." (*Id*. at ¶ 10, Attach. 5.[2])

By April 18, 2012, Horsley had not received a formal notice to proceed with the Project. (*Id*. at ¶ 11.) As a result, on April 18, 2012, Bouton sent an e-mail to Kipp requesting a confirmation that Horsley was authorized to proceed. (*Id*.) Kipp responded on April 18, 2012, stating "[h]aven't seen it yet, I am hoping by the end of the week." (*Id*., Attach. 6.)

---

[1] "The phrase that the letters "DBE" represent is not disclosed by the parties' filings.

[2] The Bouton Declaration refers cites exhibits by letters, e.g., Ex. A. However, the exhibits to his declaration are not marked by letter. The Court has referred to the exhibits by citing the electronic court filing number of each attachment to the Bouton Declaration.

5

In early May 2012, in response to Horsley's continuing requests to the County for a formal notice to proceed, County officials informed Horsley that due to the filing of a "bid protest" by Diversified, an unsuccessful bidder whose bid was more than $500,000 higher than Horsley's bid, the County had not signed the Project contract with Horsley. (*Id*. at ¶ 12.) Thereafter, "an official" working for the County told Horsley that the County had recognized that Diversified had not, and could not, meet the "Minimum Qualification Requirements" to bid on the Project. (*Id*. at ¶ 13.)

As a part of the County's response to Diversified's protest, GMIA had a joint meeting with the consultants for the incoming and outgoing legs of the baggage handling system. (Kipp Aff. ¶ 16.) During the meeting, the County and the consultants realized that separating the bidding, design, and construction of the inbound and outbound legs of the system was likely to reproduce many of the inefficiencies the County sought to avoid. (*Id*. at ¶ 17.) The County and its consultants concluded that a single, unified baggage handling system constructed by a single contractor would produce a better system for GMIA at a lower cost than two separately designed construction projects. (*Id*. at ¶ 18.)

The design consultants concurred that having a baggage system comprised of parts manufactured by a single company would operate more efficiently and economically and would reduce construction, operation, and maintenance costs. (*Id*. at ¶ 19.) They also agreed that hiring a single contractor would provide efficiencies of scale, standardization, and uniformity and reduce mobilization costs. (*Id*. at ¶ 20.) The consultants concluded that,

6

despite the complexity of the funding sources and limitations, the County could save more than one million dollars by proposing the baggage system as a single construction project. (*Id*. at ¶ 22.)

Kipp reviewed the funding for the system with GMIA's Deputy Director for Finance, Patricia Walslager ("Walslager"). (*Id*. at ¶ 24.) Subsequently, they advised Bateman that it was in the best interests of GMIA and the County to reject the bids for the outbound leg of the baggage system in order to advertise a new RFP for the combined inbound and outbound system. (*Id*.) Their recommendation was premised upon the following observations:

> (1) Bids for a unified project would likely be lower due particularly to accumulated construction efficiencies and lower overhead costs;
>
> (2) A baggage system using parts from a single manufacturer would be easier, more efficient, and less costly to operate and maintain;
>
> (3) A baggage system with uniform parts and consistent operating procedures requires less training than systems using multiple manufacturers and suppliers;
>
> (4) The use of a single manufacturer for the entire system would allow for more efficiency and lower cost in the purchase and storage of spare parts;
>
> (5) The use of a single construction contractor would increase project efficiency and lower costs because a single contractor could have economies of scale and would only be allowed a single mobilization charge to commence construction rather than two such charges;
>
> (6) A single contractor would be able to deliver the completed system in a shorter timeframe than two separate projects;

7

> (7) All bidders were advised in the "Instructions for Bidders," that: "Milwaukee County reserves the right to reject any or all proposals…[or] advertise for new proposals" (Ex. 3); and,
>
> (8) The Milwaukee County Code also reserves the right to reject all bids (*see* Milwaukee, Wis., County Code § 44.08 (2012) Ex. 4).

(Bateman Aff. ¶ 11, Exs. 3 & 4.) Based on Bateman's analysis of the circumstances presented by Kipp, Walslager, and GMIA's consultants, Bateman decided to authorize the rejection of all bids for the outbound leg of the baggage system in favor of merging the two legs of the baggage system into a single construction project with a single RFP. (*Id*. at ¶ 12.)

On May 10, 2012, the County sent out an e-mail stating that all bids on the Project had been rejected, and that the Project would be rebid. (Bouton Decl. ¶ 15.) There is a factual dispute between the parties regarding what the County told Horsley between May 10, 2012, and July 10, 2012. (*Compare* Supp. Bouton Decl. ¶¶ 3-5 to Second Kipp Aff. ¶¶ 4-5.) (ECF Nos. 23 & 29-1.) The parties also disagree about the realization of the projected cost savings if a combined baggage system is installed. (*Compare* Supp. Bouton Decl. ¶¶ 10-15 to Second Kipp Aff. ¶¶ 10-13.)

On May 11, 2012, Horsley delivered a formal written bid protest to the County. (Darrin S. Ramsey ("Ramsey") Decl. ¶ 3.) (ECF No. 7.) On May 14, 2012, Bateman wrote Horsley, stating that the County did not consider the May 10, 2012, bid protest by Horsley to present sufficient information to establish a "basis upon which . . . [the] County may reverse its rejection of bids on the project." (*Id*. at ¶ 4.) On May 17, 2012, Horsley responded to

8

Bateman, reiterating that the County should retract the rejection of Horsley's bid, its intent to rebid the Project, and immediately retract the notice of rebidding. (*Id*. at ¶ 5.) As of the June 27, 2012, the County had not responded to Horsley's May 17, 2012, letter, or taken any further action on Horsley's formal written bid protest. (*Id*. at ¶ 6.)

Horsley received a "Request for Qualifications" for a rebid of the Project on June 21, 2012, that contains the outbound and inbound baggage system. (Bouton Decl. ¶ 16, Attach. 8.) The following deadlines were included in request for qualifications: (1) Qualifications due by July 11, 2012, at 4:00 p.m.; (2) Internal review to be conducted from July 12 through July 20, 2012; and, (3) Qualified bidders to be notified by July 23, 2012. (*Id*., Attach. 8.)

**Analysis**

With respect to Horsley's motion, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify a preliminary injunction, Horsley must show that it is likely to succeed on the merits of its claims, that it is likely to suffer irreparable harm without an injunction, that the harm that it would suffer without an injunction is greater than the harm that preliminary relief would inflict upon the County and that the injunction is in the public interest. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011) *cert. denied*, __ U.S. __ , 132 S.Ct. 1635 (Feb. 27, 2012).

9

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit, while the likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Id.* at 788. These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009). In considering irreparable harm, the question is whether the party seeking relief will suffer irreparable harm in the interim period prior to the resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am. Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

Horsley asserts that it has standing to seek injunctive relief because it was the clear, fully-qualified low bidder on the Project and that the County's decision to rebid the baggage system places Horsley in imminent danger of losing the winning bid In addition, Horsley contends it meets the four-part test for issuance of a preliminary injunction.

The County counters that Horsley lacks standing, its injury is speculative and can be avoided by bidding on the revised Project. With respect to the test for injunctive relief, the County maintains that Horsley is unlikely to succeed on the merits because a public entity has discretion in awarding contracts, the proposed injunction would cause irreparable harm to the County, and Horsley has adequate legal remedies.

10

*Standing*

The parties are in apparent agreement that to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). A plaintiff must demonstrate standing separately for each form of relief sought. *Id.* at 185. The plaintiff bears the burden of proving standing. *Wis. Right to Life, Inc. v. Schober*, 528 U.S. 167, 489 (7th Cir. 2004).

As the low-bidder for the Project that also satisfied all the Project contract qualifications, Horsley sustained an injury in fact that is concrete, particularized, and actual. Horsley was informed that it had obtained the contract, only to be subsequently informed that it had not. The County's decision to revise the baggage system project and issue a new REP makes the injury fairly traceable to the County. Additionally, Horsley's injury would be redressed by the requested injunction. Horsley has standing to seek injunctive relief.

11

*Likelihood of Success on the Merits*

With respect to the preliminary injunction, a key consideration is Horsley's likelihood of success on the merits of its claim that it must be awarded the contract for the Project. Section 59.52(29)(a) of the Wisconsin Statutes,[3] describes the process by which contracts for public work are to be created.[4] Section 59.52(29)(a) states, in relevant part:

> All public work, including any contract for the construction, repair, remodeling or improvement of any public work, building, or furnishing of supplies or material of any kind where the estimated cost of such work will exceed $25,000 will be let by contract to the lowest responsible bidder. . . . A contract, the estimated cost of which exceeds $25,000, shall be let and entered

---

[3]In relevant part, section 59.52(1) of the Wisconsin Statutes provides that for counties for a population 500,000 or more, the county may create a department of administration, provide for the appointment by the county executive of a director of such department and assign such administrative functions to the department as it considers appropriate, subject to the limitations of that paragraph. However, the statute also provides:

> No such function shall be assigned to the department where the performance of the same by some other county office, department or commission is required by any provision of the constitution or statutes of this state, except that administrative functions under the jurisdiction of the county civil service commission or the county auditor may be so assigned notwithstanding sub. (8) and ss. 59.47, 59.60 and 63.01 to 63.17. Such director shall be appointed by the county executive in the unclassified civil service and is subject to confirmation by the county board, as provided in s. 59.17(2)(bm).

With respect to property, section 59.52(6)(d)(1) of the Wisconsin Statutes authorizes the county board to:

> [c]onstruct, purchase, acquire, lease, develop, improve, extend, equip, operate and maintain all county buildings, structures and facilities hereinafter in this subsection referred to as "projects", including without limitation because of enumeration swimming pools, stadiums, golf courses, tennis courts, parks, playgrounds, bathing beaches, bathhouses and other recreational facilities, exhibition halls, convention facilities, convention complexes, including indoor recreational facilities, dams in county lands, garbage incinerators, courthouses, jails, schools, hospitals and facilities for medical education use in conjunction with such hospitals, homes for the aged or indigent, regional projects, sewage disposal plants and systems, and including all property, real and personal, pertinent or necessary for such purposes.

[4]Wisconsin Statute § 59.29(29)(b) provides an exemption from procedure outlined in subsection (29)(a), when the board by resolution determines that the damage or threatened damage creates an emergency in which the public health or welfare of the country is endangered. That portion of the statute is not involved in this dispute.

12

into under s. 66.0901, except that the board may by a three-fourths vote of all the members entitled to a seat provide that any class of public work or any part thereof may be done directly by the county without submitting the same for bids.

Section 59.52(29)(a), referred to as a public bidding statute, has been construed by Wisconsin courts on several occasions.[5] In *Aqua-Tech, Inc. v. Como Lake Protection & Rehabilitation District,* 71 Wis. 2d 541, 550, 239 N.W. 2d 25 (Wis. 1976), the Wisconsin Supreme Court explained that "[s]tatutory bidding requirements are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business, as well as to insure that the public receives the best work or supplies at the most reasonable price practicable." The court also stated that "bid statutes are intended primarily for the benefit and protection of the public, and the individual bidder has no fixed, absolute right to the contract." *Id*. at 552. Indeed, a public bidding authority cannot be compelled to award the contract to the lowest bidder. *N. Twin Builders, LLC v. Town of Phelps*, 334 Wis. 2d 148, 154, 800 N.W. 2d 1 (Wis. Ct. App. 2011). A reviewing court will only interfere with the bidding authority's discretionary act if it is arbitrary or unreasonable. *PRN Assocs. LLC v. State of Wis. Dep't of Admin.*, 313 Wis. 2d 263, 268, 756 N.W.2d 580 (Wis. Ct. App. 2008).

The County has articulated sound reasons for its decision to revise the baggage project as a unified system for both incoming and outgoing baggage and issue a new REP.

---

[5] Both parties have cited decisions from other jurisdictions addressing other public bidding statutes. None of those cases have been considered, since this Court's role in applying Wisconsin law is to interpret the law as would the Wisconsin courts. The parties have not provided any basis for this Court to conclude that Wisconsin's highest court or its appellate courts would follow those decisions.

13

Two independent GMIA consultants recommended an integrated project. Kipp and Walslager also considered the consultants' recommendations before suggesting the single unified system to Bateman. The ultimate conclusion to rebid the project was made by Bateman after deliberation.

Because Horsley knew of the Diversified protest only, it tries to cast doubt upon the County's stated reasons for revising the baggage system project. However, the County had no obligation to disclose its internal deliberations to Horsley. Furthermore, Horsley's opinion that the County is incorrect regarding the expected cost reduction and efficiencies is not accompanied by supporting facts and, therefore, does not indicate that the County's reasoning may be arbitrary or irrational. Given the deferential standard of review and having considered the County's rationale for issuing a new RFP, at this initial stage, the likelihood that Horsley will succeed on the merits of its contract claim against the County is minimal.

*Irreparable Harm*

Horsley claims irreparable harm if the preliminary injunction does not issue because it will have to proceed with the time consuming process of rebidding on the baggage system. Horsley also maintains that because elements of its bid have been made public, it will be at a competitive disadvantage which will force it to undercut its previous price or risk losing the contract.

If Horsley wants to compete for the entire GMIA baggage system, it will have to engage in the process. But, expending time to prepare another bid does not seem

14

particularly harmful. That process may also be expedited for Horsely since it has already completed the work for the outgoing baggage component – the more complex component of the baggage system. Furthermore, there is no indication that other companies will be able to match Horsley's prior low bid. Horsley's claim of irreparable harm is speculative. Horsley's prior low-bid is just as likely to inhibit others from entering into the bidding process.

The County too claims irreparable harm because if it were forced to proceed with separate outbound and inbound bids, it would have to unnecessarily expend one million dollars of taxpayer money for direct costs, additional oversight, administrative burdens, additional personnel training and other costs. The County's claims of irreparable harm are backed by the prior conclusions of GMIA's consultants, Kipp, Walslager, and Bateman.

*Balancing of the Harms and Other Factors*

When the speculative harms of Horsley are balanced against the County's harms which are supported by the conclusions of independent consultants as well as experienced County personnel, the harms to the County if a preliminary injunction were to be issued outweigh those claimed by Horsley. The public interest also overwhelmingly favors the County. In light of the foregoing, Horsley's motion for a preliminary injunction is denied.

15

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Horsley's motion for a preliminary injunction (ECF No. 5) is **DENIED**.

Dated at Milwaukee, Wisconsin this 10th day of August, 2012.

> **BY THE COURT**
>
> _____
> **Hon. Rudolph T. Randa**
> **U.S. District Judge**

16

Case 2:12-cv-00655-RTR   Filed 08/10/12   Page 16 of 16   Document 32